## SMITH, Road Commissioner, v. GLENN et al.

### L. A. No. 886; August 23, 1900.

#### 62 Pac. 180.

**Highways—Dedication—Evidence.—A County Highway Termin-ated** at the western boundary of certain land, the terminal being marked by stone monuments sixty feet apart. The owner of the land employed a surveyor, who surveyed a strip sixty feet in width from the terminal of the highway to the eastern boundary of the land, and there placed a post at the northern and southern boundaries of the strip; and a map was made, showing the strip surveyed, with the eastern end closed, and filed for record in the county. At the time of the survey the owner of the land informed the surveyor and his children that his purpose was that a map might be made of the road, in order that, in dividing his land among his children, reference might be made to the map, to insure certainty of description, and that the county could not have the strip as a highway unless it paid for it. He told the children to farm up to the center of the road, which they did. The strip surveyed was never recorded or platted as a county road, and no highway connected the strip on the east. Held, that there was no dedication of it for use as a highway.

**Nuisance—Fence in Highway.—Where in an Action Against a Grantee** of the owner to abate a nuisance consisting of a fence erected by her on the strip, on the ground that the strip had been dedicated by her grantor as a highway, the defense was that there was no dedi-

cation, but that the survey and map were made merely that the map might be referred to in conveyances, to insure certainty of description, and the court found that the strip was not a highway, findings that the strip was not a continuation of the county road, and that it was not dedicated to the public by the owner, and not abandoned to the public, were not necessary.

Nuisance—Fence in Highway.—In an Action Against a Grantee of the owner to abate a nuisance consisting of a fence erected by her on the strip, it was not error to exclude the field-notes and memorandum-books of the surveyor, where it appeared that they were never shown to defendant's grantor and were not recorded, and the evidence showed that the map was made from the field-notes, and it did not appear that the notes, if admitted, would throw any additional light on the map, or the grantor's intention in having it made, and the surveyor used the field-notes in testifying, and was not restrained from stating any facts relating to the survey found in them.

Nuisance—Fence in Highway.—In an Action Against the Grantee of the owner to abate a nuisance, declarations of the owner of the land, while in possession, and at the time he was having the survey made, to the effect that the same was being made merely for convenience of reference in making conveyances, were admissible.

Evidence.—Where There were in Evidence Declarations of the Owner of the land, while in possession, and at the time the survey was being made, that the same was made merely for convenience of reference, if it was erroneous to admit declarations of the owner to the same effect made after the survey the plaintiff suffered no substantial injury by their admission, where the fact was not brought out as to how long afterward declarations were made, and, so far as appeared, they may have been made immediately afterward.

APPEAL from Superior Court, Ventura County.

Action by Alvin B. Smith, road commissioner, against Catherine Glenn and another. From a judgment in favor of defendants and an order denying a motion for a new trial plaintiff appeals. Affirmed.

F. W. Ewing for appellant; H. L. Poplin for respondents.

CHIPMAN, C.—Action to abate a nuisance and for damages. The cause was tried by the court without a jury, and defendants had judgment, from which, and from the order denying his motion for a new trial, plaintiff appeals.

Defendants are husband and wife, and plaintiff is road commissioner of the Hueneme road district, in Ventura

county, and as such brought the action. The complaint alleges: That on December 19, 1891, one John Cawelti was the owner of a certain tract of land in said district. On that day he laid out, as part of said land, a strip sixty feet wide, as and for a public highway, and dedicated and abandoned the same to the public as a highway, and that said strip ever since has been, and is now, a public highway. That about July 15, 1899, the defendant Catherine Glenn erected along the center of said highway a wire fence, and now maintains the same, which fence encroaches upon said highway to the extent of thirty feet, being the north half of said highway, and extends along said highway for the entire length of said defendants' land, being lot 1 of subdivision of tract 2 of Rancho Ex-Mission. The court found the ownership in Cawelti, December 19, 1891; that in November, 1891, he caused the land in question, together with his other said lands, to be surveyed and subdivided, and platted by map, for the purpose of dividing and deeding his said lands to his children, and filed said map for record in said county ''for the purpose of reference in making description of the parcels in the conveyances to his said children, thereafter to be made, and for no other purpose''; that it is not true that said Cawelti laid out said strip of land for a highway, or ever dedicated the same for a highway, or that it has ever been a public road or highway; that the said fence erected by defendant Catherine is not upon any public road or highway, but is on and along the line of lands of the said Catherine, as grantee and successor in interest and title of the said John Cawelti, her father. The map referred to by witnesses, and in the deeds conveying the property, shows that the easterly and westerly boundary lines of lot 1 converge at a point north of the strip of land in question. The lot is triangular; the base line being, as claimed by respondent, the center of the said strip claimed by plaintiff to be a public road. A public highway, called the ''Pleasant Valley Road,'' approaches tract 2 from the west, and terminates at the westerly line of this tract. It is marked by stone monuments sixty feet apart on this westerly line. Thence a road had been in use many years prior to 1891, continuing across tract 2 to the easterly line of said tract 2. There the traveled tracks diverged in several directions by no well-defined road. On the

easterly boundary line, in the center of said strip of land, is a quarter-section corner. As the map is the chief reliance of appellant, as indicating the intention of Cawelti, a copy of the portion illustrating the evidence is here inserted:

This diagram is not drawn to an exact scale, but substantially represents the situation. The survey and plat were made by Surveyor J. A. Barry at the instance of Cawelti, who was personally present and aided in making the survey. Mr. Cawelti's sons Andrew and Jacob also assisted. Mr. Barry testified that he began the survey by running a random line from the western end of the strip marked on the plat as a road to the east line of the tract, and there found the quarter-section corner at the east terminus of the center line of the road. He placed a post on each side of this quarter-corner on the eastern boundary line, sixty feet apart in latitude. These posts are not indicated on the plat. He testified: "I then ran back toward the west, and took a position intended for the division line between lots 2 and 3, south of the road, and set a post in the south line of this road. At the west end of this road, in the west line of the Cawelti tract, and in the east line of the Rancho Colonia, there had already been placed by other surveys a rock set in the north

line of the road and a rock in the south line of the road, sixty feet apart in latitude. . . . . I drew a plat from my survey, and got Mr. Greenwell to do the mechanical part of making the map, which is recorded and is here in evidence, from my data and field-notes. The land lying north of the road, as shown on the plat, is lot No. 1. Immediately south of and adjoining the road are lots 2 and 3. The traveled road which I have mentioned was within the boundaries of the sixty-foot road that I located. . . . . The road which I located across this tract was the east prolongation of the Pleasant Valley road. . . . . The surface of the land across the Cawelti tract, where this road is located, is practically a level loam. . . . . The road showed by its looks that it was in use, and used by wagons and vehicles.'' He further testified: ''Mr. Cawelti told me he was going to divide this tract into parcels, going to give it to his children and wife. This plat was being made for the purpose of placing it on record, that the description in the deeds might be by reference to it. . . . . Mr. Cawelti told me to run the line from the quarter-section corners on the east to the center of the Pleasant Valley road on the west; that would be the center of this road. I set the posts at the east end of the road; that is, I had my assistants assisting me to set the posts. There are no words of description of these posts set at the east end of the road marked on the map. . . . . I do not remember anything said by Mr. Cawelti about this road across his land being a public highway. I don't remember talking about the county road matter at all. The survey and map were made for Mr. Cawelti to enable him to divide his lands among his children. . . . . I followed his instructions in making the map. This was the only map delivered to him. I did not show him, nor deliver to him, my field-notes of the survey; nor, in my judgment, did he see any memoranda made by me in my book.'' It appeared from the testimony of this witness, as well as from that of others, that persons residing east of the Cawelti tract traveled this road in reaching the county seat and other of the more populous parts of the county lying west of the tract. It also appeared that there is a public road three-quarters of a mile north of the road in question, running east and west through the Calleguas ranch, and another public road running east and west about a mile south, from which fact respondent contends that there was no necessity for the road in question. Road Com-

missioner Smith (plaintiff) testified that the road in question has never been platted or recorded, or anything done to recognize it as a county road, so far as he knew, except by the map referred to. He also testified that there were no county roads connecting with this strip of land or road on the east, so far as he knew. It also appeared from Surveyor Barry's testimony that the acreage marked on lot 1 included the land to the center of the road. He testified that lot 1 contains 72.91 acres to the center of the road, and it is so marked on the plat. The foregoing is, in substance, all the evidence submitted by plaintiff. He offered in evidence the field-notes of Surveyor Barry, and his book in which they were entered, including therein a rough sketch of the plat. The court sustained an objection to their relevancy and competency, it appearing that they were not recorded, and that Mr. Cawelti never saw the field-notes, or knew what was written or sketched in the surveyor's book. Andrew Cawelti, son of the owner of the land, testified that he and his brother Jacob were the chain carriers and assisted in the survey. He testified: "To locate the line between lots one, two, and three, we started at the center of the end of the Pleasant Valley road, and ran east to the quarter-section rock. We found the rock at my father's direction. Our father told all the children that this subdivision was for the benefit of his children. He said lot No. 1 was to go to Mrs. Glenn, and told us all which lot was to go to each of us children." He further testified that the dividing line between lot 1 and lots 2 and 3 was a direct line run from the quarter-section corner to the center of the Pleasant Valley road. He testified: "At the time of the survey and afterward, he [his father] told me and my brothers and sisters that there would be no road there unless the county would buy it. He told them to farm up to the center, and if the county wanted a road it would have to buy it. After the survey he remained in possession of the land on both sides of the road up to his death," which occurred October 24, 1893. The land was farmed up to the road as used. The witness continued: "The deeds for the lands were made by my father to the children immediately after the survey, and placed in the hands of A. Levy by my father for the children, to be delivered to them at father's death; and they were kept there by Mr. Levy until father died, and then turned over to them, including Mrs. Glenn."

Jacob Cawelti, who assisted in the survey, testified, as did his brother Andrew, as to what his father said about the county buying a road if it wanted a road there. The defendant, Mrs. Glenn, testified: ''He [her father] told me, when I took possession of the place, to cultivate right up to the line, and not to give the road, and, if the county wanted a road, it could buy it. My father remained upon the place and in possession until his death. After his death I came into possession of lot 1. I caused this fence to be built on the south line of lot 1.'' The deed to defendant Catherine is dated December 19, 1891, the day the map or plat was recorded, and the description of the land is: ''Being a part of tract No. 2 of the Rancho Ex-Mission of San Buena Ventura, and being lot No. 1 of said tract No. 2, as subdivided for John Cawelti by J. A. Barry, surveyor, November, 1891, containing seventy-two and 91/100 acres (72.91), and delineated on Barry's subdivision map as lot 1, which said map was recorded December 19th, at 10:55 A. M., in book 3 of miscellaneous maps, page 30, Ventura county records, and to which map and the record thereof reference is hereby made.'' The will of John Cawelti referred to the map, and the decree of distribution after Mr. Cawelti's death contained the same description as in the deed to Mrs. Glenn, and so also did the homestead declared on the land by Mrs. Glenn in 1894. Other children of deceased corroborated the testimony of the children already shown, and one of them (Mrs. Johnson, a daughter) testified that she occupied lot 3, and caused trees to be planted on the south side of the road. She said she planted them on the north side of her orchard to protect it from the wind and sand. The evidence shows that this strip of land was traveled over as it had been before the survey by Barry, and after Mrs. Glenn built her fence there was travel along the strip on the south side of it. There were no acts of Cawelti shown which indicated a dedication before the survey, and nothing bearing upon dedication prior to the survey, except the fact that the public had used the road.

1. The real issue in the case is, Was there a public highway at the time, as alleged, over this strip of land? If not, it is immaterial whether defendant encroached upon it. Other issues, which appellant complains were not found upon, also become immaterial, if defendant was rightfully in possession of her own when she built the fence constituting the

alleged obstruction. We think there was evidence to justify the findings. Appellant cites several decisions of this court, from which he deduces the rule that "when the owner subdivides his tract, makes a map of subdivision, with a road delineated upon it, records that map, and abandons the land over which the road passes to the public use, he thereby offers to dedicate the road, as shown upon the map, to the public for a highway." "These acts," it is claimed, "in themselves unequivocally manifest an intention to dedicate the road"; citing Griffiths v. Galindo, 86 Cal. 192, 24 Pac. 1025; Archer v. Salinas City, 93 Cal. 43, 16 L. R. A. 145, 28 Pac. 839; People v. Marin Co., 103 Cal. 223, 26 L. R. A. 659, 37 Pac. 203. It is claimed, also, that the acceptance of the public was established by the continuous use of the road by the public after the map was filed; citing Smith v. City of San Luis Obispo, 95 Cal. 470, 30 Pac. 591; Hall v. Kauffman, 106 Cal. 451, 39 Pac. 756. The use by the public would have been a much stronger circumstance if it had been a new use of the land, following an apparent dedication of it. But the use was the same as before the map was filed, and there is nothing in the case to indicate that the public continued the use upon the assumption that the road was dedicated by the filing of the map, while all the evidence shows that the purpose of filing the map was to furnish a convenient means of referring to the tracts which the owner intended to convey, and there is no evidence that he had any other intention. The evidence is all one way that his intention, so far as expressed, was that there should be no road there unless the county paid for it. It will be observed that the map closes the road at its east end, and the evidence is that there is no public highway east from this point, and that there was no necessity for the road, inasmuch as there was a parallel road on the north and on the south within short distances. The evidence is that, to make the acreage of lot 1, the base line of the triangle must be the center of the road, and the uncontradicted evidence is that this line was intended to divide lot 1 from lots 2 and 3. It is not reasonable to infer from the evidence an intention to dedicate a road across this land which would have no outlet east, and which the map closed at the east end, making, as respondent well suggests, a mere cul-de-sac of this strip of land. The most that can be claimed for the map in support of appellant's contention is that it

tends to show dedication, but there is a clear conflict as to the intention of the owner, there being the map and the continuous use of the land for a road on the one side, and the positive testimony of witnesses on the other. Even the map itself may be said to testify both ways. The rule stated by appellant need not be controverted, and the case before us does not seem to call for comment on the decisions of courts cited by the parties respectively. The question being mainly one of fact, we think the evidence is sufficient to justify the findings.

2. The finding, in effect, is that the strip of land in question is not a continuation of the Pleasant Valley road, and that this strip was not dedicated to the public, and that Cawelti did not abandon it to the public. Special findings on these points were not necessary.

3. It was not error to exclude the field-notes and the memorandum-book of Surveyor Barry. They were never shown to Cawelti, and were not recorded; and, besides, the evidence shows that the map was made from these field-notes, and it was not shown that the latter, if admitted, would throw any additional light upon the map, or Cawelti's intention in having it made. Barry used his field-notes freely in testifying, and it does not appear that he was restrained from stating any fact relating to the survey found in them. There was no evidence of any discrepancy, which was not explained by Barry, between the map and the field-notes, as in Whiting v. Gardner, 80 Cal. 78, 22 Pac. 71, and Burke v. McCowen, 115 Cal. 481, 47 Pac. 367.

4. The declarations of the owner of the land while in possession, and at the time he was having the land surveyed, were admissible (Tait v. Hall, 71 Cal. 149, 12 Pac. 391; Lewis v. Burns, 106 Cal. 381, 39 Pac. 778); and the question of highway or no highway was one of fact, to be passed upon as such by the court (Tait v. Hall, supra; Smithers v. Fitch, 82 Cal. 153, 22 Pac. 935).

5. Appellant objected to the declarations of the owner, while in possession, made to his children after the survey was completed, and after the map was filed and the deeds delivered in escrow. The court admitted the evidence, and this ruling is urged as error. The evidence is that Mr. Cawelti told all his children while he was making the survey, and contemporaneously with making the deeds, that there was to

be no county road along this strip of land unless the county paid for it. Even if it is conceded that his declarations made afterward were inadmissible, it is evident that plaintiff suffered no substantial injury by their admission. The fact is not brought out as to how long afterward these declarations were made to which appellant objected. So far as appears, it may have been immediately afterward.

After a careful examination of all the evidence, we are of the opinion that the findings were sustained by the evidence, and that appellant suffered from no error of the court. The judgment and order should therefore be affirmed.

We concur: Gray, C.; Cooper, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order are affirmed.